**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

JENNIFER LYNN BERRY,

                Plaintiff,

     v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

          Defendant.

_____

Case No.  1:13-cv-01315-SKO

**ORDER ON PLAINTIFF'S COMPLAINT**

(Doc. No. 15)

## I.   INTRODUCTION

Plaintiff, Jennifer Lynn Berry ("Plaintiff"), seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") benefits pursuant to Title II of the Social Security Act.  42 U.S.C. § 405(g).  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

---

[1]   The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 5, 7.)

## II.   FACTUAL BACKGROUND

Plaintiff was born on November 29, 1959, and alleges disability beginning on August 3, 2009.  (AR 127.)  Plaintiff claims she is disabled due to abdominal pain arising from multiple surgeries and recurrent diverticulitis, pain in her neck and arms arising from bulging discs and bone spurs, severe cramping and numbness in her hands, and mental impairments including anxiety, depression, and memory loss.  (*See* AR 146; 164; 169-70; 173; 182; 212.)

**A.     Relevant Medical Evidence**

**1.      Medical Record as to Abdominal Pain**

Plaintiff was admitted to the Emergency Room at Mark Twain St. Joseph's Hospital on August 3, 2009, for acute abdominal pain associated with nausea and vomiting, and was treated for a significant colon perforation and abdominal sepsis.  (AR 330-31; 413.)  Dr. Peter Oliver, M.D., performed a sigmoid resection with an end colostomy and Hartmann's pouch, and appendectomy.  (AR 323; 379-81; 469-71; 485-89; 734-41.)  Plaintiff developed respiratory distress secondary to her sepsis and "the work of breathing," and had to be intubated.  (AR 323; 325.)  On August 18th, her wound came apart, and Plaintiff was again operated on for debridement of the surgical wound, partial fascial dehiscence repair, and wound vac placement.  (AR 242-43; 346; 384-85; 467-68; 732-33.)  The next day, Plaintiff was described as being "in good spirits" and "hopeful" (AR 348), and was described as doing "nice" and "feeling well" from the 21st to the 23rd (AR 349-50).  At discharge on August 24th, Dr. Oliver opined that Plaintiff's condition was improving, the colostomy was functioning well, and her wound was shrinking.  (AR 322-24.)

A computed tomography imaging study ("CT") taken on September 4, 2009, for follow-up on Plaintiff's colon perforation indicated interval healing of the midline incision and overall improvement evidenced by a general decrease in size of fluid collections in the colon (AR 245; 509; 727); Plaintiff was seen on September 8th for wound cleaning and closure, without incident (AR 238-41; 319-20; 464-66).  Dr. Oliver noted that Plaintiff's wound was healing well, and that she only complained to him of back pain.  (AR 240; 315.)  A CT scan on September 20th showed a small parastomal fluid collection (AR 244; 508; 725), and after the abscess was incised and

drained, Plaintiff was discharged home on September 22nd.  (AR 297-302; 480-84; 721-24.)

A colon barium enema performed on November 17, 2009, revealed scarring from diverticulitis and total occlusion of the midsigmoid, presumably secondary to diverticulitis.  (AR 507; 708-09.)  On November 24th, Plaintiff was admitted for colostomy takedown, lysis of adhesions, and repair of the ventral incisional hernia leftover from her prior surgeries.  (AR 230-37; 429-30; 446-48; 474-79; 698-705.)  Though some minor fascial necrosis and a foul smell was observed, Dr. Oliver noted that the colostomy site was healing well and discharged her home with a round of antibiotics and Vicodin and Celebrex for pain.  (AR 230-31; 462-64.)  On November 26th, Dr. Oliver noted that while her physical improvement was "fair," Plaintiff was "a bit down."  (AR 433.)  On November 30th, however, Plaintiff was described as "doing well" with "good pain control."  (AR 436.)

On January 5, 2010, Plaintiff was admitted for skin and subcutaneous skin closure.  (AR 421-22; 424-25; 460-61; 472-73; 545-46; 691-92.)  Dr. Oliver noted that the colostomy site had healed well, and closed the wound and placed an abdominal binder to maintain the closure.  (AR 424-25; 460-61; 691-92.)  A colon barium enema performed on May 24, 2010, revealed "[r]esidual diverticulosis and possible mild acute sigmoid diverticulitis suggested by spasm."  (AR 504.)  A CT scan on June 28, 2010, found diverticula, indicating Plaintiff suffered from chronic or recurrent diverticulitis.  (AR 502-03; 539; 623.)

On July 16, 2010, Plaintiff again went to the emergency room complaining of acute, spastic abdominal pain, as well as mild nausea and vomiting of the "same character in intensity" as she had experienced during her last episode of acute diverticulitis.  (AR 551-52.)  The following day, Dr. Benedicto M. Estoesta, M.D., assessed Plaintiff as having "[r]ecurrent acute diverticulitis with CT proven cecitis and diverticulosis/diverticulitis."  (AR 552.)  A CT scan taken that day showed improved diverticulitis with some diverticulosis, very little stranding and abdominal inflammation.  (AR 576.)

Dr. Oliver did a surgical consult on July 20, 2010, opining that he "doubt[ed] that [Plaintiff] had diverticulitis or cecitis without a white count, fever or classic inflammation" and that he was "perplexed with the etiology of her problem."  (AR 553-54; 814-15.)  Noting that it

1   could be a small bowel obstruction or ischemic colitis, Dr. Oliver recommended against

2   continuing antibiotics "as she actually *does not* have a disease." (AR 554 (emphasis added).) A

3   radiological exam of the abdomen on July 21st was "unremarkable" (AR 577), and an upper GI

4   with small bowel follow-thru imaging conducted on July 22nd was "normal" (AR 576; 580).

5   Plaintiff was discharged on July 23, 2010, with an order for an outpatient colonoscopy. (AR 582-

6   83.)

7        From October through December of 2010, Plaintiff continued to complain of abdominal

8   pain (AR 786; 802-03; 804-05; 809), and on December 17, 2010, she had a colonoscopy with

9   polypectomies, searching for an alternative colonic disease that might explain her ongoing

10  abdominal pain. (AR 792-93.) Plaintiff was readmitted to the hospital on March 22, 2011, for a

11  ventral hernia repair with mesh repair, and at discharge on March 24th, was noted to have

12  recurring bouts of abdominal pain, "none clearly diverticulitis." (AR 762-69.)

13       **2.      Medical Record as to Neck and Back Pain**

14       Plaintiff saw Dr. Edmund Yao, M.D., for two months in 2009, complaining of chronic

15  neck pain with left radiculopathy and right ankle pain (AR 227), and sinus pain (AR 223). In an

16  undated Adult Health History Form accompanying Dr. Yao's records, Plaintiff reported she had

17  neck and shoulder pain and recent back pain, and complained of nausea, vomiting, diarrhea, and

18  trouble sleeping. (AR 228.) Plaintiff reported she exercised regularly by doing yardwork 3 to 4

19  times per weeks, 2 to 4 hours at a time. (AR 229.) On April 8, 2009, a CT of Plaintiff's cervical

20  spine revealed "marked disc space narrowing and spurring in the lower cervical spine, particularly

21  C5-C6 and C6-C7" as well as "[s]purs narrow[ing] neural foramina bilaterally at C5-C6[,]"

22  indicating "[d]egenerative change with cervical spondylosis and possible muscle spasm." (AR

23  256.) A CT of Plaintiff's right ankle taken the same day revealed "hypertrophic spurring of the

24  distal tibia, and [ ] small plantar and dorsal calcaneal spurs" indicating "[d]egenerative change and

25  heel spurs." (AR 257.)

26       Plaintiff saw Dr. Maria Michnowska, M.D., on February 2, 2010, for complaints of chronic

27  pain in her abdomen, fatigue, and a feeling that "she has not been herself." (AR 528-29; 680-81.)

28  A Magnetic Resonance Imaging (MRI) study conducted on March 10, 2010, found disc

degeneration and bulging at C4-C5, C5-C6, C6-C7, and C7-T1, broad-based disc bulging at C6-C7, midline disc bulging at C4-C5, and broad-based disc bulging and flattening of the spinal cord and canal at C4-C5 and C6-C8.  (AR 517; 541; 542.)

On April 20, 2010, Dr. Pasquale X. Montesano, M.D., saw Plaintiff for a neurosurgical consultation, and noted that she complained of constant, severe neck pain which she self-rated at an 8/10, as well as low back pain which she self-rated at a 7/10.  (AR 514-15.)  Plaintiff claimed the pain was made worse "with bending, lifting, twisting, and prolonged standing," she could only lift light objects, and sleeping was difficult.  (AR 514.)  Dr. Montesano observed that Plaintiff had "normal" posture, stance, and gait, and appeared "to be in no acute distress."  (AR 514.)  On examination, Plaintiff's neck was "supple" with decreased range of motion, and there was no evidence of any crepitus, tenderness, spasm, or atrophy.  (AR 515.)  Her upper extremities were observed to both have full range of motion and intact sensory responses and reflexes, and Dr. Montesano opined that Plaintiff had 5/5 motor power of the "deltoids, biceps, triceps, brachioradialis, wrist dorsi, and digital dorsi and solar flexors and intrinsic muscle."  (AR 515.)  Plaintiff's lumbar spine had slightly decreased range of motion, but Dr. Montesano observed that she had full range of motion and normal responses and reflexes throughout her lower extremities. (AR 515.)  Plaintiff's thoracic spine, ribs, and pelvis all presented as normal.  (AR 515.)

Dr. Montesano further opined that Plaintiff has a herniated disc at C5-6 and C6-7, and that level "C4-5 is not quite normal."  (AR 515.)  Based on Plaintiff's subjective complaints of pain and the radiological studies, Dr. Montesano concluded that Plaintiff "has two choices, live with her pain or have surgery."  (AR 515.)  Though he recommended follow-up for a surgical consultation (AR 515), there is no follow-up opinion in the record to indicate Dr. Montesano's assessment of Plaintiff's surgical options.

### 3.    Physicians' Supplementary Certificates in Support of Disability

On February 2, 2010, Dr. Michnowska filled out a physician's supplementary certificate in support of Plaintiff's claim for state disability, opining that Plaintiff suffered from chronic pain and that because Plaintiff was "recovering from multiorgan failure due to bowel perforation" it was "difficult to predict" when Plaintiff would be able to return to work.  (AR 686.)  On April 14,

2010, Dr. Michnowska filled out another physician's supplementary certificate opining that Plaintiff suffered from chronic pain with multifactorial etiology, and indicating that Plaintiff's neck pain with hand numbness, abdominal pain, and recovery from multi-organ failure due to bowel obstruction prevented her from returning to work.  (AR 827.)  On September 27, 2010, Dr. Michnowska again filled out a physician's supplementary certificate opining that Plaintiff was permanently "unemployable."  (AR 607.)  On August 23, 2011, Dr. Paul Jacobson, M.D., filled out a physician's supplementary certificate in support of Plaintiff's claims, listing diagnoses of "cervical radiculopathy degen lumbar arm leg numbness," and opining that Plaintiff was permanently "unemployable."  (AR 839.)

**4.      Case Analyses by Non-Examining State Agency Physicians**

On August 2, 2010, state agency consultative physician Dr. R. Fast, M.D., completed a Residual Functional Capacity ("RFC") evaluation form, listing Plaintiff's primary diagnoses as cervical degenerative disc disorder and chronic diverticulitis.  (AR 585.)  He found Plaintiff could only occasionally climb ramps or stairs, balance, stoop, kneel, crouch or crawl, could only occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds, and had unlimited gross and fine manipulation.  (AR 586-87.)  Dr. Fast limited Plaintiff's ability to reach in all directions to only occasionally reaching overhead due to neck pain, to standing or walking only 6 hours in an 8-hour workday, and to sitting only 6 hours in an 8-hour workday.  (AR 586-87.)  Dr. Fast also determined that Plaintiff had no limitations for pushing or pulling, and notes that while a cervical MRI confirmed the diagnosis of cervical stenosis and he found Plaintiff's complaints "[c]redible to condition," her subjective rating of pain at an 8 out of 10 was contradicted by Dr. Montesano's "relatively mild" objective findings.  (AR 589-91.)  Based on his review of her medical records, Dr. Fast determined that Plaintiff could "do light work with postural restrictions."  (AR 589.)

In a second review on December 23, 2010, agency consultative physician Dr. W. Jackson, M.D., noted that Plaintiff had added claims of bruising, abrasions, cuts, and a sprained ankle from recurrent falls and leg collapses, and memory loss to her allegations of disability.  (AR 636.)  He noted that the alleged injuries were unsupported by the medical evidence in the file, and found no evidence that Plaintiff's condition had worsened.  (AR 637.)  Noting that Plaintiff had indicated

that her "memory loss" and anxiety were not "so severe as to cause limitations in her ability to work" because her forgetfulness and inability to concentrate were not "severe" and were "good when not in pain," Dr. Jackson found that any psychological impairments were "non severe." (AR 637.) Based on his review of the medical evidence, Dr. Jackson affirmed the initial assessment and found a "light RFC" to be appropriate. (AR 637.)

### 5.   Medical Record as to Psychological Condition

A carotid Doppler sonogram conducted on February 22, 2010, revealed no structural abnormalities of the cranial arteries, though some minimal scattered plaque was observed. (AR 544.) A Psychiatric Review Technique (PRTF) completed on January 3, 2011, by Dr. R. Paxton, M.D., found that Plaintiff had a non-severe affective disorder, having found medical evidence of a "[d]isturbance of mood, accompanied by a full or partial manic or depressive syndrome[.]" (AR 640-41.) Dr. Paxton found that Plaintiff was mildly limited in activities of daily living and social function, but had no difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation of extended duration. (AR 646.)

Dr. Donald Van Fossan, M.D., reported on his neurological consultation with Plaintiff on February 23, 2011, noting that she had complained of memory difficulty beginning with her abdominal surgery, associated with sepsis and respiratory failure. (AR 672-73.) Plaintiff reported a progressive decline since that time, feeling that her reaction times had decreased, and reported she had experienced "pursing movement of the lips and movement of the jaw when she is not wearing her dentures[,]" though those movements improved with wearing dentures. (AR 672.) Plaintiff also reported feeling depressed since her mother passed in January 2011, and stated that she did "not feel that she was depressed prior to that time." (AR 672.)

Dr. Van Fossan noted that an MRI of Plaintiff's brain had revealed "a few, punctate, nonspecific T2 hyper intensities in the white matter, mainly in the left corona radiate." (AR 672.) He found her alert and oriented, though "somewhat flat," and opined that Plaintiff was able to carry on a normal conversation, give good details of her history, and that she scored 30 out of 30 on "the mini mental status exam." (AR 672.) Evaluation of her cranial nerves, reflexes, and gait, and the motor exam and sensory exam were normal. (AR 673.)

1    Dr. Van Fossan "suspect[ed] depression may be the underlying cause" of Plaintiff's

2    complaints of memory loss, and did not detect any evidence supporting Plaintiff's allegations of a

3    movement disorder.  (AR 673.)  He did not feel that further evaluation was required, but

4    "encouraged her to start the antidepressant" she had been prescribed but had failed to start.

5    (AR 673.)

6    Dr. Michnowska noted on March 10, 2011, that Plaintiff was "undergoing a lot of stress

7    because of her situation at home[,]" between her mother's death and problems with her daughter,

8    as well as nervousness over her upcoming hernia repair.  (AR 771.)  She seemed "depressed," and

9    was started on Wellbutrin, but did not report "any difference" since starting the medication.

10   (AR 771.)  Dr. Michnowska's notes from February 16, April 12, and July 27, 2011, state that

11   Plaintiff continued to complain of depressive thoughts, due to her chronic pain (AR 754; 759) and

12   her memory loss (AR 758).

13   **B.    Testimony**

14   **1.    Plaintiff's Work History and Self-Assessment**

15   In a Work History Report completed on June 20, 2010, Plaintiff listed her prior work

16   history as a health aide and cook.  (AR 158-63.)  She explained that as a cook she had "spent the

17   last 31 years using [her] arms to stir, whip, use a knife or a spatula, 95% of the time always

18   forcing [her] head down" and as a result of the stress of using heavy equipment, like a meat slicer,

19   "could feel awfull (*sic*) burning pain in [her] neck."  (AR 163.)  She now has "to keep [her] head

20   and arms at a lowered level" because they are painful to lift.  (AR 163.)  As a result of the pain and

21   limitations of the posture she adopted to relieve the pain, Plaintiff claimed she was unable to

22   continue working full-time hours in her job as a cook.  (AR 163.)  Further, as a result of her "acute

23   diverticulitis" and surgeries, Plaintiff claimed she must be by a bathroom at all times.  (AR 163.)

24   In the Pain Questionnaire section, Plaintiff claimed that her neck and shoulder pain, a

25   "burning ache" that spread from the neck through her spine and shoulders and down her arms, had

26   begun in 2007, and her "severe" abdominal pain had begun in 2009.  (AR 164.)  She stated that

27   the pain was brought on by driving, pushing and pulling movements, raising her head, arms or

28   hands in front of her, and from prolonged standing, walking, reaching, and bending.  (AR 164.)

Plaintiff characterized the pain as "shooting hot" and lasting all day "like a toothache," and claimed that while rest and pain medication relieved her pain "a little," the pain was constant. (AR 164.)  Plaintiff noted that she stopped activities "several times daily" due to the pain, and needed assistance to drive and carry objects over ten pounds.  (AR 166.)  Though Plaintiff was able to do "household chores (sweep, load dishwasher, dust)," she could not push a vacuum cleaner or complete activities requiring "low bending."  (AR 165-66.)  She noted that she could walk 50 to 100 feet outside of her home, could stand 10 minutes at a time, could sit half an hour to an hour at a time (AR 166), and had difficulty using stairs (AR 173).

In Plaintiff's Function Report from November 2010, she stated that each day she makes her own meals and cleans up the dishes, performs "light house duties" like sweeping, dusting, light laundry, and shopping for groceries, and takes short walks of 10 to 30 minutes that are limited in length by "bleeding issues."  (AR 175-77, 178, 182.)  Plaintiff claims that she needs assistance with buttons, and cannot shave her legs or keep her arms above her shoulders to style her hair without "great pain."  (AR 176.)  She will not shower unless someone else is at home, because she gets "dizzy" and had fallen three times in five months.  Plaintiff is afraid to drive "both physically and mentally" and complains that using the clutch repeatedly "hurts the bottom of [her] spine" and she fears that she will "run a stop sign, forget to shift (*sic*)."  (AR 176; *see also* AR 178.)  She also complains that she suffers from anxiety and memory loss (AR 176, 180-81, 182), and notes that the "cramping" in her hands and limited range of motion in her neck have stopped her from engaging in several hobbies (AR 179, 182).

## 2.    Plaintiff's Testimony at Hearing

Plaintiff testified at her September 20, 2011, hearing that she has a GED, with past work experience as a home health attendant and as a cook.  (AR 49-57.)  Plaintiff testified that in August of 2009, she was hospitalized with a perforated colon, and has been unable to work since that time by her "arms" and her "abdomen."  (AR 49.)  She testified that parts of her legs "go numb" while sitting for too long (AR 49, 56), that she has "pinched discs and impinged cord, and it affects [her] movements" and causes "cramping through [her] arms into [her] hands and fingers" and affects her lower back. (AR 50.)   She also testified that while Dr. Montesano had

recommended surgical intervention to address her neck complaints, Plaintiff had not scheduled surgery because she was "not ready" for neck surgery after "six" abdominal surgeries.  (AR 50-51.)  Plaintiff admitted that she had not undergone physical therapy or had injections in her neck for the pain, but would take pain pills and keep her arms "resting on something" to alleviate the pain. (AR 51.)

Plaintiff testified she can walk about ten minutes or half a block to a block at a time, and she walks to her doctors' appointments and to the hospital.  (AR 52.)  She stated she cannot sit for too long at one time, and has to alternate between sitting and lying down.  (AR 52.)  She is able to do light chores around the house like washing dishes, but lacks the "downward strength" to wash a pan.  (AR 52-53.)  She can use a lightweight "Swiffer," but her daughter does any mopping and sweeping because the broom is too heavy.  (AR 55.)

Plaintiff also testified she has to use a chair and sit in the shower (AR 53), and has nearly fallen while getting out of the bathtub (AR 55).  She has some difficulties with standing still, and has had three almost-falls within the past year and a half.  (AR 55.)  She cannot shave her legs, style, or cut her hair by herself, because she cannot raise her arms above her head very long and cannot use scissors easily.  (AR 53.)  Plaintiff testified that she takes naps once or twice a day for 30 to 45 minutes, and has trouble staying asleep at night.  (AR 54.)  She has to be close to a bathroom because she has to urinate ten times a day.  (AR 54-55.)  Plaintiff also testified that she has abdominal pain from sitting, she cannot lift anything over ten pounds off the floor per physician's orders, and that she has "gotten very forgetful" since being put on a morphine drip during her first hospitalization in 2009.  (AR 56.)

### 3.    Plaintiff's Daughter's Third Party Assessment

Plaintiff's daughter, Katherine Berry ("Katherine"), filled out an adult third-party Function Report on November 10, 2010.  (AR 183-90.)  The report is substantively nearly identical to the report Plaintiff herself filled out.  Katherine stated Plaintiff suffered from restlessness and pain that interrupted her sleep, and during the day she is able to care for Katherine's son and take occasional walks. (AR 183-84.)  Plaintiff does light chores around the house for 30 to 60 minutes each day, including sweeping, dusting, and dishes, and goes outside once or twice a day on

average.  (AR 185-86.)  Plaintiff goes shopping two or three times a month, for 10 to 45 minutes at a time, but doesn't drive because she doesn't feel safe and cannot afford to drive.  (AR 186.) Katherine stated Plaintiff can walk up to 15 minutes before needing rest, but she must rest for an hour before resuming walking.  (AR 188.)  Katherine noted changes in Plaintiff's capabilities, stating that Plaintiff can no longer lift more than five pounds per her physician's order, has problems/pain when reaching above her head, and experiences pain while climbing stairs and sometimes loses her footing.  (AR 190.)

Plaintiff is limited in her self-care in that she occasionally needs assistance with buttons, zippers, bras, hair styling, plucking her eye brows, and shaving her legs.  (AR 183-84.)  Katherine noted Plaintiff's "hands have become stiff like arthritic," which affects her fine manipulation skills.   (AR 190.)   Katherine also stated that while Plaintiff had formerly enjoyed walking, camping, fishing, and arts and crafts, she is unable to do much "since her illness."  (AR 187.) Plaintiff socializes on the phone and attends church and other social gatherings, though she "doesn't go out as much due to pain, discomfort and lack of money."  (AR 187-88.)

Though Katherine described Plaintiff as having memory problems, being confused more easily, and needing reminding and occasional help with following instructions, she stated Plaintiff *is* able to pay attention "as long as necessary."  (AR 185; 188-89; 190.)  Katherine also described Plaintiff's mental state, noting that she experiences mood swings that vary from slight to moderate.  (AR 189.)

## C.    Administrative Proceedings

On November 10, 2011, the ALJ issued a decision and determined Plaintiff was not disabled.  (AR 25-37.)  The ALJ found that Plaintiff had severe impairments including cervical spine with bulging discs, obesity, history of surgically repaired colon perforation, history of diverticulosis, and post-repair incisional hernia.  (AR 27.)   The ALJ determined that these impairments did not meet or equal a listed impairment.  (AR 30.)  The ALJ found Plaintiff retained the residual functional capacity ("RFC") "to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can lift or carry up to 20 pounds occasionally, 10 pounds frequently.  She can stand or walk up to 6 hours and sit up to 6 hours.  She should not be required

1    to climb ladders, ropes or scaffolding.  She should not work at heights or around hazardous

2    machinery.  She can occasionally perform bilateral overhead reaching." (AR 30.)

3        Given this RFC, the ALJ found that Plaintiff was unable to perform any past relevant

4    work.  (AR 36.)  After considering Plaintiff's age, education, work experience, and RFC, the ALJ

5    determined there were other jobs that existed in significant numbers in the national economy she

6    could perform, including work as a cashier, cleaner, and packer. (AR 36-37.)  The ALJ concluded

7    that Plaintiff was not disabled, as defined in the Social Security Act, from August 3, 2009, the

8    alleged onset date, to the date of the decision.  (AR 37.)

9    **D.**      **Plaintiff's Complaint**

10        On August 19, 2013, Plaintiff filed a complaint before this Court seeking review of the

11    ALJ's decision.  (Doc. 1.)  Plaintiff argues that the ALJ failed to fully develop the medical record

12    and improperly based his non-disability finding exclusively on the opinion of a non-examining

13    agency consulting physician, and failed to articulate clear and convincing reasons for finding

14    Plaintiff's and her daughter Katherine's statements less than fully credible.  (Docs. 11; 14.)

15                   **III.**    **SCOPE OF REVIEW**

16        The Commissioner's decision that a claimant is not disabled will be upheld by a district

17    court if the findings of fact are supported by substantial evidence in the record and the proper legal

18    standards were applied.  42 U.S.C. § 405(g); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007);

19    *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v.*

20    *Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Davis v. Heckler*, 868 F.2d

21    323, 325 (9th Cir.1989); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999); *Tidwell v. Apfel*,

22    161 F.3d 599, 601 (9th Cir. 1999); *Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985) (the

23    findings of the Commissioner as to *any* fact, if supported by substantial evidence, are conclusive.)

24    Substantial evidence is more than a mere scintilla, but less than a preponderance.  *Ryan v. Comm'r*

25    *of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008); *Saelee v. Chater*, 94 F.3d 520, 521

26    (9th Cir. 1996).  "'It means such evidence as a reasonable mind might accept as adequate to

27    support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison*

28    *Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

"While inferences from the record can constitute substantial evidence, only those 'reasonably drawn from the record' will suffice." *Widmark v. Barnhart*, 454 F.3d 1063, 1066 (9th Cir. 2006) (citation omitted); *see also Desrosiers v. Sec'y of Health and Hum. Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (the Court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion.") The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

The role of the Court is *not* to substitute its discretion in the place of the ALJ – "[t]he ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir.2001) (citations omitted); *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002); *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (the court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely."); *see Sprague v. Bowen*, 812 F.2d 1226, 1229-30 (9th Cir. 1987) (if substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive). The court will not reverse the Commissioner's decision if it is based on harmless error, which exists only when it is "clear from the record that an ALJ's error was 'inconsequential to the ultimate nondisability determination.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006) (quoting *Stout v. Comm'r*, 454 F.3d 1050, 1055 (9th Cir. 2006)); *see also Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

//

//

//

# IV.   APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3) (A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).   The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy.   42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability.   In Step 1, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§ 404.1520(b), 416.920(b).   If not, the ALJ must determine at Step 2 whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities.   *Id.* §§ 404.1520(c), 416.920(c).   If so, the ALJ moves to Step 3 and determines whether the claimant has a severe impairment or combination of impairments that meet or equal the requirements of the Listing of Impairments ("Listing"), 20 § 404, Subpart P, App. 1, and is therefore presumptively disabled.   *Id.* §§ 404.1520(d), 416.920(d).   If not, at Step 4 the ALJ must determine whether the claimant has sufficient RFC despite the impairment or various limitations to perform her past work.   *Id.* §§ 404.1520(f), 416.920(f).   If not, at Step 5, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy.   *Id.* §§ 404.1520(g), 416.920(g).   If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps.   *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

//

//

## V.   DISCUSSION

Plaintiff contends that the ALJ erred by failing to develop the record and by finding Plaintiff's and her daughter Katherine's testimony less than credible.

### A.   The ALJ Did Not Have a Duty to Further Develop the Record

Plaintiff argues the ALJ erred by not further developing the record once he rejected Drs. Michnowska and Jacobson's physicians' supplemental certificates opining that Plaintiff was "unemployable." (Doc. 11, 13-14.)  Plaintiff's argument appears to be based on a belief that treatment and examining records that do not contain a specific "opinion" from a treating source render them inadequate for a proper disability determination.  (Doc. 11, 13-14 ("the record contains absolutely no assessment from a treating or examining source regarding the specific limitations that stem from [Plaintiff's] disorders" and "the record remains devoid of any specific assessments of her [RFC] from a treating or examining source.").)  This inadequacy, according to Plaintiff, triggered the ALJ's duty to recontact the treating source or order a consultative examination.

### 1.   Legal Standard

The ALJ has a duty "to fully and fairly develop the record and to assure the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).  The duty to develop the record is "triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001); *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) ("Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to conduct an appropriate inquiry."); *see* 20 C.F.R. §§ 404.1512(e), 416.912(e) ("When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision."); 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).  Where the record itself establishes ambiguity or inadequacy, it is unnecessary for the ALJ to make a specific finding of "ambiguity" or "inadequacy" of the record to trigger this duty to inquire and further develop the record. *McLeod v. Astrue*, 640 F.3d

881, 885 (9th Cir. 2011).

**2.      Although the Four Supplemental Certificates Were Rejected, the Record Was Not Inadequate or Ambiguous**

The fact that a medical record does not contain a specific opinion from a treating source does not, by itself, render that record inadequate or ambiguous.  *See, e.g., Jewell v. Astrue*, No. 1:09-CV-0348-SKO, 2010 WL 3238849, at *5 (E.D. Cal. Aug. 12, 2010) (citing *Orn v. Astrue*, 495 F.3d 625, 631-34 (9th Cir. 2007) (while a treating physician's opinion is entitled to deference, the absence of such an opinion does not automatically render a medical record insufficient).   In rejecting Dr. Michnowska's February, April, and September 2010 supplemental certificates (AR 34-35), and Dr. Jacobson's August 2011 supplemental certificate (AR 35), the ALJ did not automatically render the record inadequate and thereby trigger a duty to further develop the record.  *Jewell*, 2010 WL 3238849, at *5.

The supplemental certificates comprise only four pages of an approximately 830-page record.  (*See* AR 607, 686, 827, 839.)  The supplemental certificate completed by Dr. Michnowska in February 2010 concludes, without any detailed description or analysis, that it was "difficult to predict" when Plaintiff would be able to perform her regular or customary work while she was recovering from her bowel perforation and resultant multiorgan failure.   (AR 34; 686.)  Dr. Michnowska's April 2010 supplement certificate similarly lacks specific findings.  (AR 34-35.)  Although it provides an estimated date for Plaintiff to return to work, it ignores the listed question of "how the claimant's condition or impairment prevents her from returning to regular and customary work," and instead recapitulates Plaintiff's various diagnoses without offering any opinion as to how those conditions limited her capacity to work.  (AR 827.)  Dr. Michnowska's September 2010 and Dr. Jacobson's August 2011 statements were even more terse, limited to filling in a blank line with their opined diagnoses, and checking boxes next to "permanent" and "unemployable."  (AR 607; 839.)  Dr. Jacobson's sole substantive comment that Plaintiff "was [a] cook now [has] difficulty standing or sitting" (AR 839) does not actually offer an opinion as to the limitations imposed by his assessed diagnoses.   None of these supplemental certificates actually describe Plaintiff's medical history or her observed physical or mental condition, opine to any

16

1   limitation imposed by their diagnoses, or provide an explanation for their determination Plaintiff

2   was "unemployable."   The ALJ properly rejected the supplemental certificates to the extent that

3   they found Plaintiff "unemployable," a topic reserved to the Commissioner (AR 35), and to the

4   extent that the forms were cursory and failed to provide detailed limitations or objective findings

5   (AR 34-35.)[2]   Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir.2002) ("[t]he ALJ need not accept

6   the opinion of any physician, including a treating physician, if that opinion is brief, conclusory,

7   and inadequately supported by clinical findings.").

8        Even without these four supplemental certificate opinions, the 830-page record was

9   unambiguous and adequate for review.  Medical evidence from treating physicians Drs. Oliver *and*

10  Michnowska, and from examining physicians Drs. Montesano and Van Fossan, was before the

11  ALJ.  This is not a case where the four rejected supplemental certificates – four pages essentially

12  only listing Plaintiff's diagnoses – comprised the entire treating record and were rejected.

13  Plaintiff's argument that the ALJ "granted exclusive controlling weight . . . to the opinion of a

14  doctor who never examined [Plaintiff] at all" misrepresents the ALJ's decision.  (Doc. 11, 15.)

15  Aside from discounting the specific opinions contained within Drs. Michnowska and Jacobson's

16  supplemental certificates, the ALJ considered the other treating or examining physicians' records.

17        For example, when discussing Plaintiff's history of abdominal pain, the ALJ specifically

18  pointed to Dr. Michnowska's treating notes to support his finding that Plaintiff's abdominal

19  condition and subjective pain had "improved" and that by June of 2010, her pain had "almost

20  completely resolved."  (AR 31.)   Though Plaintiff alleges that Dr. Oliver's records prove her

21  "gastrointestinal condition is most definitely not 'under control'" (Doc. 11, 15), the ALJ pointed

22  directly to Dr. Oliver's opinion that Plaintiff has "no musculoskeletal, endocrine or hematologic

23  problems[,]" his notes opining that he "doubted she had diverticulitis or cecitis" and that her

24  diagnosis of acute abdominal pain was "improving" (AR 31).   The State agency reviewing

25  physician's opinion that "[w]hile the claimant did undergo several operations for perforated

26

27  [2]   The ALJ also rejected in part Dr. Jacobson's August 2011 supplemental certificate, because he could not determine
    whether Dr. Jacobson had actually provided treatment to Plaintiff.  Dr. Jacobson was not listed among Plaintiff's

28  treatment providers in Exhibit 12E, and there were no corresponding treatment notes from Dr. Jacobson within the
    record to either establish their treating relationship or to substantiate his opined limitations.  (AR 35.)

diverticulitis with complications, it appears this condition is now under control[,]" is based directly upon these records.   (AR 35.)     Finally, though Plaintiff points out she has since undergone a follow-up hernia repair in March 2011, Dr. Oliver's discharge directions imposed only *temporary* limitations to "lifting and straining" and driving.   (AR 31-32.)   The medical evidence is not ambiguous as to Plaintiff's claim of chronic abdominal pain, even without the four supplementary certificates.

Further, when discussing Plaintiff's history of neck and back pain, the ALJ specifically pointed to Dr. Michnowska's progress notes observing Plaintiff's ability to ambulate and independence in activities of daily living.   (AR 32-33.)   The ALJ then pointed to spinal surgeon Dr. Montesano's examination of the Plaintiff in April 2010, made with the benefit of an April 2009 cervical spine x-ray and a March 2010 cervical spine MRI.   (AR 32.)   Dr. Montesano noted Plaintiff's subjective report of "constant, severe pain," her reported limitations to lifting light objects and difficulty sleeping, and her belief that "her problem was the result of cumulative trauma from [her work]."   (AR 32.)   However, on examination, the findings showed Plaintiff

> . . . was neurovascularly intact.   She had normal posture and normal stance and appeared to be in no acute distress.   She had normal stance and normal gait.   Her neck was supple but motion was slightly decreased.   There was no malalignment or asymmetry noted.   There was no evidence of any crepitus, tenderness or spasm. No atrophy was noted.   There was full range of motion of both upper extremities. There was 5/5 motor power of the deltoids, biceps, triceps, brachioradialis, wrist dorsi, and digital dorsi and volar flexors and intrinsic muscle.   The biceps, triceps, brachioradialis and pectoral reflexes were normal.   Sensory exam of both upper extremities was intact.   Hoffman sign was negative.   Her thoracic spine had no tenderness or spasm.   Range of motion of her lumbar spine was slightly decreased.   She had full range of motion in both lower extremities.   Knee and ankle reflexes are normal.   Radiological studies were reviewed showing a herniated disc at C5-6 and C6-7.   C4-5 was "not quite normal" (Exhibit 4F, page 4).   The MRI of the cervical spine showed disc bulge and cord impingement at C4-5 and C5-6.   Dr. Montesano concluded by noting "I think she has two choices, live with her pain or have surgery.   She's going to think about it.   I would like to see her back in two months for re-evaluation."

(AR 32-33.)

The ALJ then reviewed Plaintiff's *subsequent* medical history supporting Dr. Montesano's opinion.   He noted that Dr. Michnowska observed Plaintiff could ambulate independently on June 1 and June 4, 2010.   (AR 33.)   Dr. Oliver observed her as ambulatory and well appearing on

October 27 and November 5, 2010, and ambulatory, independent in activities of daily living, and without motor or sensory deficits on December 9, 2010.  (AR 33.)  Dr. Fossan reported that Plaintiff complained of chronic neck pain and decreased range of motion in her neck, but was ambulatory and independent in activities of daily living, and appeared well.  (AR 33.)  On July 27, 2011, Dr. Oliver observed that Plaintiff's neck had decreased range of motion while her back was normal, her extremities were nontender, she had no motor or sensory deficits, she was ambulatory and independent in activities of daily living, and she appeared well.  (AR 33.)  The medical evidence is not ambiguous as to Plaintiff's claim of chronic neck and back pain, even without the four supplementary certificates.  This is not an inadequate record requiring further development.

Finally, the ALJ pointed specifically to notes by treating Dr. Michnowska to support his findings that Plaintiff's medically determinable mental impairment of depression was nonsevere and imposed only minimal limitations and no episodes of decompensation.  (AR 28-29.)  The ALJ also pointed to examining neurologist Dr. Van Fossan to support his determination, noting that Dr. Van Fossan had opined that Plaintiff carried on a normal conversation, provided good details of her history, scored 30/30 on the mini mental status exam, and "depression may be the underlying cause" of her complaints of memory loss.  (AR 28.)  The ALJ only relied on the non-examining State agency reviewing physician's opinion to buttress that determination, as it was "consistent with the treatment notes . . . which indicate that the claimant's mental status has been noted to be normal on numerous occasion" and was "also consistent with the rather substantial activities of daily living."  (AR 28.)  The medical evidence is not ambiguous as to Plaintiff's claim of mental impairment, particularly since the four supplementary certificates did not address the issue.  *See, e.g., Magallanes v. Bowen*, 881 F.2d 747, 751-55 (9th Cir. 1989) (ALJs may permissibly rely on non-examining physicians as substantial evidence when their opinions are supported by and consistent with other evidence in the medical record).

Plaintiff points to no conflict or insufficiency in the medical record that would require the ALJ to seek clarification from the physicians who had treated Plaintiff in the past.  The medical records from those providers were before the ALJ for consideration—even though none of those physicians provided a formal written opinion as to Plaintiff's functional limitation.  Plaintiff is

1  essentially arguing that once the ALJ received records from physicians who had treated her in the
2  past, even though the medical evidence of record was clear and provided sufficient evidence to
3  decide the claim, the ALJ was under a *sua sponte* duty to solicit formal and current opinions from
4  those physicians.  "There simply is no such duty to collect further evidence absent inconsistency,
5  conflict, or a lack of evidence in the medical record such that additional or supplement medical
6  evidence is necessary to make a decision on the claim."  *Jewell*, 2010 WL 3238849, at *7; *see also*
7  20 C.F.R. §§ 404.1512(e), 416.912(e).

8       Plaintiff further fails to point to any evidence in the record that would contradict the RFC
9  finding.  Consistent with the diagnoses in the record, the ALJ determined that Plaintiff's cervical
10  spine with bulging discs, obesity, history of surgically repaired colon perforation, history of
11  diverticulosis, and post-repair incisional hernia were severe impairments.  (AR 27.)  There was
12  substantial evidence, however, that, despite these impairments, Plaintiff could perform light,
13  unskilled tasks.  Plaintiff argues that the ALJ had a duty to develop the record to cure any
14  deficiencies; however the ALJ did *not* find the record deficient, and by rejecting the supplemental
15  certificates, he did not automatically render the record deficient.  The ALJ clearly identified
16  substantial evidence within the medical record to support his conclusions.  (AR 31-36.)  The fact
17  that the ALJ relied upon medical evidence detrimental to Plaintiff's claim, and rejected the four
18  cursory and conclusory supplemental certificates that Plaintiff preferred, does not mean the record
19  was inadequate or required development.  *Jewell*, 2010 WL 3238849, at *5.

20       In sum, the ALJ's decision was supported by substantial evidence within the record and
21  sufficiently specific to allow the Court to conclude that he did not err by failing to further develop
22  the record.

23  **B.      The ALJ Did Not Err in Assessing Plaintiff's Credibility**

24       Plaintiff next argues the ALJ failed to articulate clear and convincing reasons for
25  discounting her statements regarding the severity and extent of her ongoing symptoms.  (Doc. 11,
26  18.)  Plaintiff argues that the ALJ erroneously relied on inconsistencies between the medical
27  evidence and her subjective allegations of pain, a single inconsistency between her statements on
28  the reasons she cannot drive, and a perceived inconsistency between her activities of daily living

and her claim of disability.  (Doc 11, 18-20.)   The Commissioner contends the ALJ relied on evidence in the record that undermined the credibility of Plaintiff's subjective complaints and demonstrated "that she was capable of greater functioning than she claimed[.]"  (Doc. 13, 7.)

### 1.  Legal Standard

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009); *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc).  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged.  *Vasquez*, 572 F.3d at 591. The claimant is not required to show that his impairment "could reasonably be expected to cause the severity of the symptom [he] has alleged; she need only show that it could reasonably have caused some degree of the symptom."  *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036).   If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives "specific, clear and convincing reasons" for the rejection.  *Id.*

The ALJ also may consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony, (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and (3) the claimant's daily activities.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); 20 C.F.R. §§ 404.1529, 416.929.  "If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing."  *Tommasetti*, 533 F.3d at 1039.

### 2.  The ALJ Pointed to Substantial Evidence in the Record to Discount Plaintiff's Credibility

The ALJ reviewed the medical record from Plaintiff's original hospitalization for colon perforation and diverticulosis in August of 2009 through her subsequent abdominal surgeries. (AR 31; 33.)   He also reviewed the diagnostic studies and surgical consultation Plaintiff underwent to evaluate her chronic neck and back pain.  (AR 32-33.)  Finally, the ALJ considered

1  Plaintiff's allegations that she is unable to perform all work due to her alleged impairment and

2  other symptoms.  (AR 33.)  When considered in light of the objective medical findings and other

3  evidence, the ALJ found Plaintiff's statements regarding her pain and other symptoms were not

4  "particularly convincing or credible" (AR 33) and Plaintiff's "allegations regarding her degree of

5  pain [we]re not supported by the treatment record."  (AR 34.)

6      Plaintiff argues that the ALJ "extract[ed] the single most benign portion of the treatment

7  notes" observing that Plaintiff "appeared well" while "wholly ignor[ing] the concomitant findings

8  from those notes that she was also suffered (*sic*) with persistent abdominal pain warranting

9  continued prescription of [pain medication[.]"  (Doc. 11, 18-19.)  The Commissioner disagrees,

10  arguing that "while Plaintiff underwent several operations for her gastrointestinal impairment, the

11  record showed that her condition improved and came under control."  (Doc. 13, 8.)  While the

12  inconsistency of objective findings with subjective claims may not be the sole reason for rejecting

13  subjective complaints of pain, *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), it is

14  one factor which may be permissibly considered with others, *Moisa v. Barnhart*, 367 F.3d 882,

15  885 (9th Cir. 2004); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

16  Here, for example, the ALJ pointed to multiple inconsistencies between Plaintiff's reports of pain

17  and treating physician Dr. Oliver's observations between February 2010 and July 2011:

18  
19  
20  
21  
22  
23  
24  
25  
26  
27  
> While the claimant reported chronic pain on February 2, 2010, she was noted to be in no distress (Exhibit 5F, page 11.)  On April 20, 2010, the claimant was noted to be "pleasant" and in no acute distress despite reporting constant, severe pain that she rated as 8/10 (neck pain) and 7/10 (back pain) (Exhibit 4F, page 2). On June 4, 2010 (Exhibit 5F, page 2), she said she was feeling much better and the pain was almost completely resolved and on June 14, 2010 she said she was feeling much better (Exhibit 5F, page 1).  Yet in a statement submitted to the Administration just six days later, she reported constant pain (Exhibit 5E).  On September 27, 2010 (Exhibit 13F, page 2) the claimant reported 8/10 pain, but she was noted to be well appearing and in no acute distress. On October 27, 2010 she was again noted to be well appearing (Exhibit 25F, page 60).  On November 5, 2010, the claimant was (Exhibit 25F, page 55) ambulatory, appeared well, and was independent in activities of daily living.   The claimant reported chronic abdominal pain on March 10, 2011, but she was noted to be in no distress and pleasant (Exhibit 25F, page 22).  Despite reporting chronic neck pain on April 12, 2011 (Exhibit 25F, page 7), the claimant appeared well.  On July 27, 2011, the claimant appeared well (Exhibit 25F, page 3).

28  //

22

1   (AR 34.)  The ALJ also pointed to the contradiction between Plaintiff alleged neck pain of 8/10

2   and weakness, and spinal surgeon Dr. Montesano's "relatively mild" objective findings – made on

3   examination with the benefit of diagnostic studies confirming spinal stenosis.  (AR 35.)

4          The ALJ also discounted Plaintiff's subjective testimony because of the overall

5   improvement in her condition.  (AR 31-34.)  Plaintiff contests the ALJ's emphasis of "the single

6   most benign portions of the treating notes" in finding that Plaintiff "appeared well."  However,

7   citing observations by four treating and examining physicians over the course of two years is not

8   'cherry-picking' medical evidence.  ALJs may permissibly point to "medical signs and laboratory

9   findings that . . . demonstrate worsening or improvement of the underlying medical condition" to

10  "draw appropriate inferences about the credibility of an individual's statements."  *See* SSR 96-7p.

11  Here, the ALJ pointed to substantial medical evidence within the medical record, including

12  observations and notes by treating physicians Drs. Oliver and Michnowska, as well as examining

13  physicians Drs. Montesano and Van Fossan, as inconsistent with Plaintiff's subjective complaints.

14         For example, the ALJ pointed to Plaintiff's reports to her treating physicians in the summer

15  of 2010 that she "was feeling much better and the pain was almost completely resolved.  She

16  denied being in any pain.  [S]he was able to ambulate and she was independent in activities of

17  daily living."  (AR 31.)  When admitted to the hospital for pain she described as being similar in

18  intensity to her original hospitalizing pain, Dr. Oliver could find no objective support for her pain

19  in diagnostic exams, and discontinued antibiotics because "she actually does not have a disease."

20  (AR 554.)  Further, even when reporting extreme chronic pain throughout 2010 and 2011, Plaintiff

21  repeatedly appeared "in no acute distress and pleasant" and was observed to be ambulating

22  normally, independent in activities of daily living, and "appearing well."  (AR 32-34.)

23         The Court must review the medical record as a whole, and if substantial evidence exists to

24  support the ALJ's conclusion, the Court must affirm that decision.  *Desrosiers v. Sec'y of Health*

25  *and Hum. Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (the Court must review the record as a whole,

26  "weighing both the evidence that supports and the evidence that detracts from the

27  [Commissioner's] conclusion.").  When reviewed as a whole, substantial evidence within the

28  record indicated that Plaintiff indisputably suffered a gastrointestinal impairment, which

1    necessitated several surgeries to repair, and subsequent to those surgeries, her condition has

2    improved.   (AR 33-34.)   The ALJ did not error in considering Plaintiff's records indicating

3    improvement in her condition.

4         Next, in discounting Plaintiff's credibility, the ALJ pointed to inconsistencies in Plaintiff's

5    testimony about why she had stopped driving, noting that she had claimed at one point she could

6    not drive for "financial reasons, and because it was difficult to operate the floor pedals (Exhibit

7    8E)" and later claimed it was "because her reaction times had decreased and she was afraid to

8    drive a car (Exhibit 22F, page 2)."  (AR 34.)  Plaintiff argues that these statements are not actually

9    inconsistent because they were proffered in different contexts and do not actually directly conflict

10   with one another.  (Doc. 11, 22-23.)  She contends that the ALJ "insist[ed] upon a meaningful

11   inconsistency" where there "is simply no real inconsistency between her two statement that would

12   warrant even questioning her veracity much less discrediting it."  (Doc. 11, 22-23.)  However, the

13   ALJ did not rely on Plaintiff's inconsistent explanations as his sole articulated reason for

14   discounting her credibility.  In listing the inconsistencies between Plaintiff's subjective complaints

15   and the medical evidence (AR 33-35), the ALJ pointed out that Plaintiff had proffered two

16   inconsistent reasons for not being able to drive, one to her examining neurologist and the other on

17   a disability form.  (AR 34.)  This was not the sole basis for the ALJ's decision; this was one

18   additional inconsistency within the record that the ALJ permissibly considered in evaluating

19   Plaintiff's credibility.  *See Moisa*, 367 F.3d at 885; *Thomas*, 278 F.3d at 958-59;  *Verduzco v.*

20   *Apfel*, 188 F.3d 1087, 1090 (9th Cir. 1999) (ALJs may consider whether the Plaintiff's testimony

21   is believable or not).   Moreover, the ALJ was entitled to make an inference regarding the

22   discrepancy between the statements.   The fact that Plaintiff can offer a second, rational

23   interpretation to synthesize the statements does not permit the Court to discard the ALJ's

24   credibility finding.  *Thomas*, 278 F.3d at 954; *Andrews*, 53 F.3d at 1041; *Sprague*, 812 F.2d at

25   1229-30.

26        Finally, the ALJ discounted Plaintiff's credibility as being inconsistent with her admitted

27   activities of daily living.   Plaintiff disputes the significance of her ability to engage in these

28   activities, and argues that the ALJ should not have "denigrate[d her] credibility on the basis of

24

[her] ability to perform the most basic of daily activities." (Doc. 11, 20.)  The Commissioner responds that "[a]lthough these activities may not directly translate into an ability to perform light work, they certainly showed that Plaintiff was able to sit, stand and walk longer than she alleged[.]" (Doc. 13, 7.)  While the mere fact that a claimant engages in certain daily activities does not necessarily detract from her credibility as to overall disability, daily activities support an adverse credibility finding if a claimant is able to spend a substantial part of her day engaged in pursuits involving the performance of physical functions or skills that are transferable to a work setting.  *Orn*, 495 F.3d at 639; *see also Thomas*, 278 F.3d at 959.  A claimant's performance of chores such as preparing meals, cleaning house, doing laundry, shopping, occasional childcare, and interacting with others has been considered sufficient evidence to support an adverse credibility finding when performed for a substantial portion of the day.  *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008); *Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005); *Thomas*, 278 F.3d at 959.  Here, the ALJ appropriately considered Plaintiff's admitted activities of daily living:

> She has consistently been noted to be independent in activities of daily living (Exhibit 5F, page 2, 4; 7F, page 2; 13F, page 2; 25F, pages 7, 52, 55, 60).  She goes for walks (Exhibit 5E), reads, watches television, prepares meals, cleans the dishes, performs light household chores such as sweeping, cleaning laundry, and dusting, interacts with her grandchild, shops for groceries, uses public transportation, handles her finances, visits with others twice a week, (Exhibit 8E).

(AR 34.)

Contrary to Plaintiff's contention, her admitted activities are not "the most basic of daily activities."  This is not a case where the plaintiff testified that she was completely dependent for her activities of daily living.  Plaintiff was noted by her treating and examining physicians on multiple occasions to be independent in her activities of daily living.  (AR 34.)  She prepared her own meals, performed light household chores, took public transportation, went for daily walks, shopped for groceries, did yardwork, and visited with others – these types of activities tend to suggest Plaintiff is still be capable of performing the basic demands of unskilled work on a sustained basis.  *See, e.g., Stubbs-Danielson*, 539 F.3d at 1175 (the ALJ sufficiently explained his reasons for discrediting the claimant's testimony because the record reflected that the claimant

1   performed normal activities of daily living, including cooking, housecleaning, doing laundry, and

2   helping her husband in managing finances – all of which "tend[ed] to suggest that the claimant

3   may still be capable of performing the basic demands of competitive, remunerative, unskilled

4   work on a sustained basis.").

5         Here, the ALJ pointed to substantial evidence within the record to support a finding that

6   the breadth of Plaintiff's admitted daily activities and the underlying medical condition established

7   by the medical record were inconsistent with Plaintiff's subjective complaints of disabling pain.

8   The Court is not tasked with substituting its discretion in the place of the ALJ, *Edlund*, 253 F.3d at

9   1156; *Macri*, 93 F.3d at 534; where "evidence is susceptible to more than one rational

10   interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld[,]"

11   *Thomas*, 278 F.3d at 954; *Andrews*, 53 F.3d at 1041.  Just because there is more than one way to

12   reasonably interpret the evidence in the record, does not mean that the ALJ committed reversible

13   error.  *See, e.g., Sprague*, 812 F.2d at 1229-30.  The ALJ articulated clear and convincing reasons

14   for rejecting Plaintiff's subjective complaints, and permissibly discounted her credibility.  *Cf.*

15   *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004).

16         In sum, the ALJ's reasons were properly supported by the record and sufficiently specific

17   to allow the Court to conclude that he rejected the claimant's testimony on permissible grounds,

18   and did not arbitrarily discredit Plaintiff's testimony.

19   **C.      The ALJ Did Not Err in Assessing the Credibility of Lay Testimony**

20         Plaintiff contends the ALJ also erred in rejecting the evidence from her daughter

21   Katherine.  Plaintiff argues that the ALJ's reasons for finding her daughter to be less than fully

22   credible "fall well short of the exacting 'clear and convincing' standard, and the adverse

23   credibility finding cannot stand." (AR 21.)  The Commissioner argues that Katherine's statements

24   as to Plaintiff's physical symptoms were properly discounted as unsupported by the medical

25   evidence and inconsistent with Plaintiff's daily reported activities, and her statements as to

26   Plaintiff's memory deficits were properly discounted as inconsistent with the medical evidence.

27   (Doc. 13, 9.)

28   //

### 1.    Legal Standard

Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he expressly determines to disregard such testimony and gives reasons germane to each witness for doing so.  *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001); *Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006); *see also* 20 C.F.R. § 416.913(d)(4).  In rejecting lay witness testimony, the ALJ need only provide "arguably germane reasons" for dismissing the testimony, even if she does "not clearly link [her] determination to those reasons."  *Lewis*, 236 F.3d at 512.  An ALJ may reject lay witness testimony if it is inconsistent with the record.  *See, e.g.*, *id.* at 511-12 (rejecting lay witness testimony conflicting with the plaintiff's testimony and the medical record); *Bayliss v. Barhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) (rejecting lay witness testimony conflicting with the medical record).  The ALJ may "draw inferences logically flowing from the evidence."  *Sample v. Schweiker*, 694 F.2d 639, 642.  Further, "[i]f the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness."  *Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir.2012).

### 2.    The ALJ Pointed to Substantial Evidence in the Record to Permissibly Discount Plaintiff's Daughter's Credibility

The ALJ noted that Plaintiff's daughter Katherine had filled out a third-party statement indicating that Plaintiff needed assistance while dressing and doing her hair, did not drive, had "slight mood swings[,]" and was limited to lifting only 5 pounds "as per her Dr.'s orders." (AR 35-36.)  Further, Katherine's stated that Plaintiff "must rest after walking for 15 minutes and ha[d] problems lifting, reaching, climbing, completing tasks, concentrating, understanding, and using her hands."  (AR 35.)  The ALJ gave Katherine's statements "reduced weight" because

> . . . The limitations are not consistent with the objective findings by the spine surgeon, who found relatively minimal limitations.  Mental status has been essentially normal on numerous occasions, including just one month after this statement was written (Exhibit 25F, page 52).  The claimant's activities are not consistent with the degree of limitation alleged by Katherine Berry."

(AR 36.)

//

1    The ALJ was clear the primary reason Katherine's lay testimony was given reduced weight

2    was because it was inconsistent with the preponderance of medical opinions and the observations

3    made by medical sources.  (AR 36.)   The ALJ pointed to Dr. Montesano's objective findings,

4    weighing heavily his observations of Plaintiff's "normal" posture, stance, gait, and reflexes, "intact

5    sensory exam" and "full range of motion" in her upper extremities and lower extremities, the

6    absence of observed signs or symptoms of acute distress, tenderness, crepitus, atrophy, or spasm

7    despite her reported pain levels, and only slightly decreased neck and lower back motion.  (AR

8    32.)  The ALJ further pointed to Dr. Montesano's observation that Plaintiff had "5/5 motor power"

9    of the deltoids, biceps, triceps, brachioradialis, wrist dorsi, and digital dorsi and volar flexors and

10   intrinsic muscle, as "relatively minimal" objective findings inconsistent with Plaintiff's subjective

11   complaints.  (AR 32.)

12       Plaintiff contends the ALJ mischaracterized Dr. Montesano's objective findings, because

13   Dr. Montesano's conclusion that Plaintiff could either "live with her pain or have surgery" "can

14   hardly be described as the assessment of a 'relatively minimal' condition.'"  (Doc. 11, 23-24.)

15   Based on his observations and Plaintiff's diagnostic studies, Dr. Montesano did indeed opine that

16   Plaintiff could either elect to have surgery to relieve her symptoms, or continue to live with her

17   symptoms.  (AR 515.)  There is, however, no follow-up surgical consultation or surgical plan in

18   the record to indicate Dr. Montesano's opinion on the surgical intervention necessary to treat

19   Plaintiff's symptoms, or the degree of relief reasonably expected from surgical intervention.

20   Further, nowhere in the consultative report did Dr. Montesano opine that, absent surgical

21   intervention, Plaintiff's symptoms would worsen.  Contrary to Plaintiff's argument, Dr. Montesano

22   did not opine that surgery was absolutely necessary; Dr. Montesano opined that despite a report of

23   neck pain of 8/10 and lower back pain of 7/10, Plaintiff's examination was largely "normal" with

24   full range of motion in the upper and lower extremities, and slightly decreased range of motion in

25   the lumbar spine.  (AR 514-15.)  These are "relatively minimal" findings of limitation.

26       Further, the ALJ looked at the treating physician's medical evidence subsequent to Dr.

27   Montesano's report, to indicate whether the medical evidence supported Plaintiff's pain report.

28   One month after Dr. Montesano's evaluation, Plaintiff rated her pain as 3/10, and two months later

Plaintiff reported "she was feeling much better and the pain was almost completely resolved[.]" (AR 33, *see* AR 525, 520.)   Over the next seven months, Drs. Michnowska and Oliver noted Plaintiff to be ambulatory, independent in activities of daily living, well appearing, and with no motor or sensory deficits.  (AR 33, *see* AR 519, 521, 801, 804, 809.)  Dr. Van Fossan observed no motor weakness, normal gait, and intact sensation during a neurological examination nearly a year after Dr. Montesano's consultation.  (AR 33, *see* AR 672-73.)  The ALJ did not rely on a "mere quantum" of medical evidence; he identified sufficient evidence of Plaintiff's underlying medical condition to adequately support his conclusion that Katherine's lay testimony was inconsistent with the medical evidence.  *See Richardson*, 402 U.S. at 401.

The ALJ's finding that Katherine's statements conflicted with the weight of the medical evidence was a proper reason for rejecting her statements.  *Lewis*, 236 F.3d at 503 ("One reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence").  That the ALJ gives an additional reason for rejecting Katherine's lay testimony – that Plaintiff's daily activities are inconsistent with the limitations Katherine alleges – only gives an additional, germane reason underlying his decision to discount her testimony regarding the intensity, duration, and limiting effects of Plaintiff's symptoms.  *See, e.g., Stubbs-Danielson*, 539 F.3d at 1175.

In sum, the ALJ's reasons were properly supported by the record and sufficiently specific to allow the Court to conclude that he rejected Katherine's testimony on permissible grounds, and did not arbitrarily discredit Katherine's testimony.

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social

//

//

//

//

//

1  Security.  The Clerk of this Court is DIRECTED to enter judgment in favor of Carolyn W. Colvin,

2  Acting Commissioner of Social Security, and against Plaintiff Jennifer Lynn Berry.

3

4  IT IS SO ORDERED.

5     Dated:    **January 6, 2015**                        **/s/ Sheila K. Oberto**
                                                   UNITED STATES MAGISTRATE JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28